**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| **v.** | **NO. 1:11-CR-212-TCB-GGB** |
| **JHONNY VAZQUEZ-VELAZQUEZ**<br>**and RAUL VALENCIA-**<br>**HERNANDEZ,** | |
| **Defendants.** | |

## FINAL REPORT AND RECOMMENDATION

Defendants Jhonny Vazquez-Velazquez and Raul Valencia-Hernandez ("Defendants") are each charged with one count of possession with intent to distribute cocaine, one count of possession with intent to distribute methamphetamine, one count of possession of a firearm in furtherance of a drug trafficking crime, and one count of being illegal aliens in possession of a firearm, in violation of 21 U.S.C. §§ 841(a) and (b) and 18 U.S.C. §§ 924(c) and 922(g).

Pending before this Court are Defendant Vazquez-Velazquez's Motion to Suppress Evidence [Doc. 20], Motion to Suppress Statements [Doc. 21], and his Preliminary Motion to Suppress Identification Testimony [Doc. 22]. Defendant Valencia-Hernandez has pending a Motion to Sever [Doc. 27], a Motion to Suppress

Evidence [Doc. 28], and a Motion to Suppress Statements [Doc. 29].[1] An evidentiary hearing on these motions was held before me on September 22, 2011. All transcript references ("T. __") are to the transcript of that hearing. My recommended rulings on the motions follow.

## I.   FACTS

In September 2008, local law enforcement agents were conducting an investigation using a state authorized wiretap that led them to suspect that illegal drugs were being stored at 1986 Benthill Drive, Marietta, Georgia. (T. 8-10). During the same time frame, agents of the Drug Enforcement Administration (hereinafter "DEA") in Charleston, South Carolina, developed evidence that a target of their investigation had traveled to the vicinity of 1986 Benthill Drive for the purpose of picking up illegal drugs. (T. 8-10, 52).

On September 16, 2010, DEA Agent Darren Krawczyk ("Krawcyzk") and a group of agents went to 1986 Benthill Drive for the purpose of conducting a "knock and talk." (T. 55-56). Krawczyk had a "firm belief," based on the wire intercepts, that illegal narcotics were in that house. (T. 31).

---

[1] Defendant Valencia-Hernandez also filed a motion for new counsel [Doc. 38], which I addressed at the evidentiary hearing. Accordingly, Defendant Valencia-Hernandez's motion for new counsel [Doc. 38] is **DENIED AS MOOT**.

AO 72A
(Rev.8/8
2)

Eight agents participated in the operation. Krawczyk was dressed in plain clothes but had on a ballistics vest that stated that he was a law enforcement officer. (T. 11). He had a weapon that was holstered, but visible. (<u>See</u> T. 12, 18). The other officers were dressed similarly to Krawczyk, and their weapons were also visible, holstered, and accessible. (T. 58-59).

Four agents stationed themselves around the house. Krawczyk and three other agents approached the front door. (T. 11, 58). At approximately 2:35 p.m., Krawczyk knocked on the door, and soon afterward, Jhonny Vazquez-Velazquez answered the door. (T. 11-13, 56). Krawczyk told Vazquez-Velazquez that they were at the residence for the purpose of investigating a kidnapping. Krawczyk had pictures of the purported kidnapping victim, and asked if he could come into the house to talk about the kidnapping. The kidnapping story was not true; the agents made up the story as a ruse to gain entry into the house in order to attempt to find the drugs that they believed were in the house.[2] (T. 13, 31, 56).

---

[2] There was no direct testimony that the agents' purpose in employing the kidnapping ruse was to gain entry into the house to search for drugs. However, I have no difficulty in inferring such a purpose because: (1) the agents had a "firm belief," based on the wiretaps, that drugs were in the house (T. 31); (2) the agents asked for consent to search as soon as they entered the house; (3) the agents called for a drug detection dog after their initial search did not uncover drugs; and (4) the Government's brief does not argue that there was any other reason for wanting to enter the house.

3

AO 72A
(Rev.8/8
2)

Vazquez-Velazquez said that the agents could come in and talk to him. After Vazquez-Velazaquez allowed them to enter, Krawczyk asked if there were any other persons there. Vazquez-Velazquez indicated that there was one other person in the house. Krawczyk had Vazquez-Velazquez call the other occupant, Raul Hernandez-Valencia, downstairs to meet with the agents. (T. 14).

Once the agents were inside the house, they asked Vazquez-Valazquez if they could search the house for the fictitious kidnapping victim and for any other individuals in order to ensure the agents' safety. (See T. 14-15, 60). Vazquez-Valazquez said "yes"; Valencia-Hernandez nodded. (T. 15). Three agents, including Krawczyk, stayed with the Defendants in the foyer while at least three agents drew their weapons and searched the residence for additional people. (T. 18-19). While the search for persons was taking place, Krawczyk, continuing with the kidnapping ruse, showed the Defendants a picture of the purported kidnapping victim and asked the Defendants if they recognized the person in the picture. As expected, the Defendants responded that they had not seen the person in the picture. (T. 60).

By approximately 2:40 p.m., the search for persons was complete. (T. 62). No additional individuals were discovered in the house. (T. 19).

Immediately afterward, agents moved Defendants to a living area in an upstairs

4

loft area of the house.  (T. 16, 19).  Then Krawczyk asked Defendants if there were any weapons, drugs or large amounts of money derived from the sale of narcotics in the house.  Both stated that there were not.  (T. 20).  Krawczyk then asked if the agents could search for those items.  (T. 20-21).  Both Defendants said "yes," and signed consent-to-search forms.  (T. 20-22).  The consent forms stated in Spanish and English:

> 1.    I have been asked to permit Special Agents of the Drug Enforcement Administration to search 1986 Benthill Drive, NE, Marietta, Ga.
>
> 2.    I have not been threatened, nor forced in any way.
>
> 3.    I freely consent to this search.

(Gov't Exs. 2, 3).

At this point, six agents were inside the house.  Two or three stayed with the Defendants, and the remaining three or four searched the house.  (T. 26, 61).

Within a few minutes, agents discovered three firearms in a linen closet at the end of the upstairs hallway.  (T. 27, 71).  They also found a rifle wrapped in a bed sheet, and two handguns wrapped in a pillow case.  (T. 27).  Krawczyk then confronted the Defendants about finding the firearms.  Krawczyk's demeanor was "a little angry." (T. 29).  Krawczyk told the Defendants that they had lied to him when they told him

AO 72A
(Rev.8/8
2)

that there were no guns in the house. (T. 93). Both Defendants denied knowledge of the firearms. (T. 29-31).

The search continued. After approximately thirty more minutes, no narcotics or money had been located. (T. 31, 72, 74). However, Krawczyk believed, based upon the wiretapped conversations, that narcotics were somewhere in the house. Therefore, he called for a canine officer to come and perform a search with a drug dog. (T. 31). Defendants were not asked for consent – and did not provide consent – for additional officers or a narcotics-detecting dog to enter the residence. (T. 96).

Officers continued to search the house until close to the time that the canine unit arrived, which was approximately 30 to 45 minutes after Krawczyk's call. (T. 31, 74, 96). By this point, the agents had been in the residence for approximately one hour and a half. (T. 73). No money or drugs had been found. (T. 74).

When the canine unit arrived, the dog searched the ground floor of the house, beginning with the garage. (T. 95-97). Then the dog and its handler, Officer Beasley, went upstairs where the Defendants were located. (See T. 95-98). The Defendants had not seen the dog prior to that point. (T. 97-98). Once upstairs, the dog alerted to the presence of narcotics on the floor of a vanity in the master bathroom. (T. 34, 75). After taking the dog back to his squad car, Officer Beasley returned to the upstairs bathroom

AO 72A
(Rev.8/8
2)

with Krawczyk and inspected the vanity more closely. When Beasley manipulated a five-inch molding board at the front bottom of the vanity, he found that it was loose. (T. 35). Beasley then worked the board to create a gap between the board and the floor of the vanity. (T. 76-78). Beasley shined his flashlight through the gap and saw plastic containers. After removing the board, officers found and seized from underneath the vanity 16 kilograms of suspected cocaine, four plastic containers each holding a pound of crystal methamphetamine, and approximately $7,000 in cash. (T. 35-36, 78).

At that point, Krawczyk returned to the living area and instructed the other officers to place Vazquez-Velazquez and Valencia-Hernandez in handcuffs. (T. 37, 42, 79). Krawczyk then told Vazquez-Velazquez and Valencia-Hernandez that they were under arrest and read them Miranda warnings. (T. 38, 79). Krawczyk asked them "if they would like to cooperate, . . . if they would answer any questions." (T. 38). They both shook their heads "no" and did not make any statements at that time.

Agents seized the Defendants' wallets from their persons. Each wallet contained a Mexican driver's license for the respective defendant. Valencia-Hernandez's wallet also contained a photocopy of a Washington driver's license for him. (T. 46).

Several cellular telephones were found on the mantle in the living room. (T. 38-39, 46, 100-03). Krawczyk and the group of agents with him immediately "dumped"–

AO 72A
(Rev.8/8
2)

i.e., retrieved – all the information stored in the phones. (T. 105). Krawczyk testified that it is important to dump the phones because messages can be erased and people can "pull the chip out and the information can be lost." (T. 101).

Krawczyk asked the Defendants which telephones belonged to whom. (T. 39, 79). Defendants answered, and through their answers, agents were able to determine which phones belonged to which defendant. (T. 39, 100). Agents were then able to associate each defendant with incriminating conversations on particular phones. (T. 39-40, 43, 102-03).

Agents found clothing and shoes in the residence that were consistent with Defendants' sizes. (T. 109-10, 114-15). In response to questioning regarding which clothes belonged to which defendant and which rooms they stayed in, Valencia-Hernandez stated that they both stayed in the master bedroom. (T. 41, 98-99).

Agents also found scales, documents that appeared to be drug ledgers, and packaging materials. (T. 44-46). Krawczyk did not remember when and where many of these items were found. (T. 93, 103).

Additional facts are discussed in context below.

AO 72A
(Rev.8/8
2)

## II.  DISCUSSION ON MOTIONS TO SUPPRESS

### A.  Standing

The Government first argues that Defendants lack standing to challenge the search of 1986 Benthill Drive, Marietta, Georgia.  The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."  <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998).

The evidence at the hearing established that Defendants were living at 1986 Benthill Drive.  Vazquez-Valazquez had leased the house using a different name.  (T. 53-54).  One of the bedrooms contained children's clothing.  (T. 108).  One of the photographs entered into evidence appears to depict a child's stuffed animal.  (Gov't Ex. 5).  The house also contained adult clothing and shoes consistent with Defendants' sizes, and Defendants told the agents that they lived and slept in the house.  The house had a television set on a stand, other electronic devices, an area rug, artwork on the walls, garden hoses, potted plants on the front porch, and other decorative items.  (Def.'s Ex. 1).  Defendants were playing video games during the search.  (T. 25).  Thus, the house appeared to be one in which the Defendants lived, as opposed to one that was used primarily for an illegal drug business.

9

The Government does not argue that Defendants were not living at the residence. Rather, it argues that Defendants did not have a legitimate expectation of privacy in the residence because they used the residence as an illicit drug stash house. In support of its argument, the Government cites <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998). In <u>Carter</u>, two visitors came to an apartment for the sole purpose of packaging cocaine and were only in the apartment for approximately 2 1/2 hours. <u>Id.</u> at 86. The Court held that the visitors lacked a legitimate expectation of privacy in the apartment because they were present simply for a business transaction, were only in the home for a few hours, and had no previous relationship with the apartment lessor. The Court specifically noted that the visitors were not overnight guests, and distinguished <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990)(which held that overnight guests had standing to challenge the search), in part, on the ground that there was nothing "similar to the overnight guest relationship" that had existed in that case. <u>Carter</u>, 525 U.S. at 90-91. <u>Carter</u> is obviously distinguishable on its facts from the instant case in that the individuals challenging the search in <u>Carter</u> were not living in the residence that had been searched.

Two Eleventh Circuit cases cited by the Government suggest that even persons who spend the night in a particular residence may lack a legitimate expectation of privacy in that residence if they use it primarily to operate an illegal drug operation.

AO 72A
(Rev.8/8
2)

See <u>United States v. Cooper</u>, 203 F.3d 1279, 1285 (11th Cir. 2000)(noting that, "[b]ecause the evidence in this case suggests Defendants were using the hotel room *predominantly* to engage in narcotics trafficking, Defendants likely would lack standing even if they had been the overnight guests of Gonzalez.")(italics added); <u>United States v. Bell</u>, 218 F. App'x 885, 895 (11th Cir. 2007)(unpublished)(where there was ample evidence that the defendant used a certain apartment in his drug operation, the defendant did not have a reasonable expectation of privacy as an overnight guest there because he was using the apartment "*primarily* for commercial purposes")(italics added). However, these cases are distinguishable.

Notwithstanding the Government's evidence that the house at 1986 Benthill Drive was used for some drug activity, the evidence does not establish that the house was used *primarily* for drug operations. Based on the evidence discussed above, I conclude that Defendants met their burden of showing that they lived in the house and used it for ordinary activities of daily living, and thus, had a legitimate expectation of privacy in the house.

### B.    <u>Entry Using a Ruse</u>

The well-known general rule is that a search of a private home without consent is unreasonable under the Fourth Amendment unless it has been authorized by a valid

AO 72A
(Rev.8/8
2)

search warrant. See Michigan v. Tyler, 436 U.S. 499, 506 (1978)(citing Camara v. Municipal Ct. of City & County of San Francisco, 387 U.S. 523, 528-29 (1967)). There is a presumption that a warrantless search of private property is *per se* unreasonable unless the search falls within one of the clearly delineated exceptions to the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585 (1980) (citation omitted).

Where the validity of a search rests on consent, the Government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. Florida v. Royer, 460 U.S. 491, 497 (1983). The Government also bears the burden of proving that the consent was not a mere submission to a claim of lawful authority. Id. at 497, 511. In deciding whether the Government has met its burden, the court must consider the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).

AO 72A
(Rev.8/8
2)

The Government has cited no Eleventh Circuit or Supreme Court case law that addresses the issue of whether the police violate the Fourth Amendment when they enter a residence after receiving consent that is given in response to a law enforcement ruse in which officers request assistance in locating a victim of an unrelated crime. Rather, the Government cites several cases which stand for the proposition that the Fourth Amendment is not violated when the police use undercover agents who misrepresent their identity for the purpose of enticing defendants to confide or disclose wrongdoing.

To be sure, the use of undercover agents and stratagems in police investigations has long been sanctioned in many cases, including those cited by the Government. See, e.g., Lewis v. United States, 385 U.S. 206 (1966)(holding that the entry of undercover officers into the home of suspects to buy contraband did not violate the Fourth Amendment); United States v. Guidry, 534 F.2d 1220 (6th Cir. 1976)(holding that Secret Service stratagem of having agent pose as a helper of a service representative who was invited into defendants' home to look at defendants' printing press did not violate the Fourth Amendment); United States v. Miglietta, 507 F. Supp. 353, 355 (M.D. Fla. 1980)(holding that undercover agents did not violate Fourth Amendment when they entered defendant's home disguised as delivery personnel). However, these

13

AO 72A
(Rev.8/8
2)

cases do not involve situations, like in the current case, in which the police exploit a person's desire to assist the police in preventing harm to another individual, when the real motivation of the police is to find incriminating evidence against the person who is persuaded to assist.

There is at least one such case in another jurisdiction, <u>United States v. Montes-Reyes</u>, 547 F. Supp. 2d 281, 290 (S.D.N.Y. 2008), where the district court ruled on this issue in very similar circumstances, and thoroughly discussed and analyzed the law on law enforcement officers' use of deception to gain entry into and search a residence. In <u>Montes-Reyes</u>, a federal law enforcement officer, displaying local law enforcement credentials, knocked on the defendant's hotel room door, told him that they were looking for a missing girl, and showed him a flyer containing a picture of a four-year old girl and a picture of a woman next to the caption "Abductor." The heading on the flyer was "Endangered Missing." <u>Id.</u> at 283. The officer then asked the defendant if the officer could enter the room in order to search for the missing girl, and the defendant consented. The officer was in fact a DEA agent, and was not seeking to search the defendant's room for the missing girl, but rather to search it for evidence of drug dealing. <u>Id.</u> The officer entered the room and looked around, and was soon joined by three more officers. They asked if the defendant had any guns, and

AO 72A
(Rev.8/8
2)

when he stated he did not, the officers asked the defendant for consent to search for weapons. The defendant was then presented with a written consent-to-search form, which he signed. During the subsequent search, the officers discovered a bag containing narcotics. Id. at 283-84.

In finding the entry into the defendant's room unlawful, the Montes-Reyes court discussed three categories of cases in which consent to search was obtained following a police ruse or misrepresentation. The first category involves cases where the person whose consent is sought is left with the impression that his consent cannot lawfully be withheld, such as in Bumper v. North Carolina, 391 U.S. 543, 550 (1968), where the law enforcement agents falsely claimed that they already possessed a warrant to search the premises, and United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990), where an ATF agent, without identifying himself, accompanied a state regulator on a licensing inspection. In such cases, the ruses led the courts to conclude that the consent was not the product of an essentially free and unconstrained choice. Montes-Reyes, 547 F. Supp. 2d at 287-88.

The second category is comprised of cases where law enforcement officers, acting in an undercover or uniformed capacity, advise the person whose consent is sought of certain dire or otherwise exigent circumstances and request permission to

15

enter or search the premises purportedly for the purpose of investigating or addressing those circumstances. The <u>Montes-Reyes</u> court gave as examples <u>United States v. Giraldo</u>, 743 F. Supp. 152 (E.D.N.Y. 1990), in which agents posing as gas company workers asked for permission to enter to check for a gas leak, and <u>Krause v.Kentucky</u>, 206 S.W.3d 922 (Ky. 2006), where police falsely claimed that a young girl had just reported being raped by the defendant's roommate in the residence and requested permission to come in to determine whether the victim's description of the residence and its furnishings was accurate. Under such circumstances, courts have found that consent is not voluntary because the consentor was led to believe that there was a life-threatening emergency and that his consent to search was required to prevent such a calamity. Under <u>Montes-Reyes</u> and the cases it cites as examples of this category, such a ruse does not present the suspect with a "free choice." <u>Montes-Reyes</u>, 547 F. Supp. 2d at 288. <u>See also</u> <u>United States v. Hernandez-Juarez</u>, No. SA-09-CR-19-XR, 2009 WL 693172, at *1 (W.D. Tex. Mar. 16, 2009)(relying, in part, on <u>Montes-Reyes</u> and granting defendant's motion to suppress evidence and statements obtained by Immigration and Customs Enforcement ("ICE") agents after gaining consent from defendant's sister to enter sister's apartment using the ruse that they were searching for

16

an unrelated person depicted in a photograph, when the agents were actually there to search for the woman's son, a fugitive alien).

With respect to the second category of police misrepresentation, the court in Montes-Reyes quoted with approval the following passage from WAYNE R. LAFAVE, ET AL., *Criminal Procedure* § 3.10(c) (3d ed. 2007): "[W]hen the police misrepresentation of purpose is so extreme that it deprives the individual of the ability to make a fair assessment of the need to surrender his privacy, as in *People v. Jefferson*, [43 A.D.2d 112, 350 N.Y.S.2d 3 (1973)] where police gained entry to defendant's apartment on the false claim they were investigating a gas leak, the consent should not be considered valid."

The final category discussed by the court in Montes-Reyes includes cases in which the deception in question was the use of an undercover agent who obtained otherwise voluntary consent though the use of his adopted identity. Montes-Reyes, 547 F. Supp. 2d at 288 (citing Lewis, 385 U.S. at 209, in which the Court stated that "in the detection of many types of crime, the Government is entitled to use decoys to conceal the identity of its agents."). In Montes-Reyes, as in the instant case, the Government relied upon cases that fall into this third category. (See Gov't Br. at 15, citing Lewis, Guidry and Miglietta).

The <u>Montes-Reyes</u> court cautioned against a *per se* rule in deciding whether a deceptive law enforcement tactic vitiates voluntary consent. <u>Montes-Reyes</u>, 547 F. Supp. 2d at 290. Still, the court found that the deception utilized in that case "created a false sense of exigent circumstances" similar to the gas leak scenario in the second category of cases. <u>Id.</u> at 291. The court concluded that the allegation of a missing child was "precisely the kind of 'extreme' misrepresentation of investigatory purpose by which a person is 'deprive[d] . . . of the ability to make a fair assessment of the need to surrender his privacy.'" <u>Id.</u> (quoting LAFAVE, *Crim. Proc.* § 3.10(c)). Also, since the defendant knew that he did not have a missing child in his hotel room, he "would have every reason to believe that his failure to consent to the search would hinder or delay the efforts to resolve safely (what appeared to be) a grave emergency about which the authorities were sufficiently concerned that they dispatched a squad of agents to investigate." <u>Id.</u> As a result, the court concluded that the defendant's decision to let the agents into his hotel room was not "'the product of an essentially free and unconstrained choice.'" <u>Id.</u> (quoting <u>Schneckloth</u>, 412 U.S. at 225).

The present case is very similar to <u>Montes-Reyes</u>. The agents' misrepresentation involved a kidnapping victim and was designed to create a similar sense of urgency. As in <u>Montes-Reyes</u>, the agents implied that consent was needed to help locate the

18

AO 72A
(Rev.8/8
2)

kidnap victim. The Defendants would have logically concluded that their failure to consent to the search "would hinder or delay the law enforcement efforts to resolve safely (what appeared to be) a grave emergency about which the authorities were sufficiently concerned" that they sent numerous armed law enforcement officers to investigate. Id. Based on the reasoning in Montes-Reyes, I find that the cases on which the Government relies are not persuasive, that Defendants' consent to the agents' entry into the home was not voluntary, and therefore the agents' entry was unlawful.

I also find that the former Fifth Circuit's decision in Securities and Exchange Commission v. ESM Government Securities, Inc., 645 F.2d 310 (5th Cir. Unit B May 1981) supports the conclusion that the Defendants' consent to the initial entry was not voluntary.[3] In ESM, a SEC investigator came to the defendant's office falsely stating that he was investigating another firm in the building, and requested an overview of the government securities market from the defendant. The request led to a tour of the operations and an explanation of the procedures. Id. at 311. The defendant then gave further tours to the same SEC investigator and SEC attorneys, leading the SEC to issue a subpoena from the information gathered from the tours. Id. at 312. The Fifth Circuit

_____

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former 5th Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

held that courts should not be used to permit the government to gather information that is the fruit of the government's deception. Id. at 316. As a result, the Court determined that the subpoena should not issue on remand if the district court found that: (1) the SEC intentionally misled the defendant; (2) the defendant was actually misled; and (3) the subpoena was the result of the SEC's improper access to ESM's records. Id. at 317-18.

Although the instant case is a criminal case and does not involve administrative subpoenas, I find the former Fifth Circuit's reasoning persuasive on the issue of deceit in the instant case. The Fifth Circuit stated:

> We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. We think it clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.

Id. at 316. This statement lends support to the conclusion that Agent Krawczyk's deception was an impermissible method to gain entry into Defendants' house and rendered Defendants' consent to the entry involuntary. Based on the cited authorities, I find that the entry into the Defendants' home violated the Fourth Amendment.

20

AO 72A
(Rev.8/8
2)

## C.   Consent After Entry

The Government argues that even if the entry was unlawful, Defendants' subsequent consent to search was sufficiently attenuated from any taint.

When the Government relies on consent to justify a search that follows an illegal entry, the Government must prove two things: first, that the consent was voluntary; and second, even if voluntary, that the consent was not the product of the illegal entry. United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007); see also United States v. Santa, 236 F.3d 662, 676-77 (11th Cir. 2000); United States v. Quintana, 594 F. Supp. 2d 1291, 1303 (M.D. Fla. 2009)(stating that "[a] consent to search may be insufficient where the consent itself springs from prior illegal activity by the police, such as an unlawful entry."). I will assume, without deciding, that Defendants' consent to search, once the agents were in the house, was voluntary, and proceed to discuss whether their consent was the product of the officers' illegal actions.

Three non-exclusive factors are helpful in making this determination: "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and particularly, [3] the purpose and flagrancy of the official misconduct." Delancy, 502 F.3d at 1309 (citing Santa, 236 F.3d at 677). Applying those factors, the court in Delancy upheld a consent search that followed an illegal

21

entry. The entry in <u>Delancy</u>, while illegal, was made because of a genuine concern for officer safety and not for the purpose of conducting a search. <u>Id.</u> at 1304.

As to the third factor, which the <u>Delancy</u> court considered to be the most important one, the court stated:

> **If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, we would be bound to find the consent tainted.** Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even necessary. <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 505, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (opinion of White, J.) (finding evidence seized after an illegal arrest tainted and omitting the attenuation analysis entirely when the seizure was part of "the officers' attempt to gain [the defendant's] consent to a search of his luggage").

<u>Delancy</u>, 502 F.3d at 1312 (emphasis added).

Here, as discussed above, I have concluded that the agents' entry was made for the purpose of gaining consent to conduct a full-scale search for drugs.[4] Therefore, no further attenuation analysis is necessary as <u>Delancy</u> requires the conclusion that the consent was tainted by the illegal entry. For these reasons, I RECOMMEND that all

---

[4] The Government does not argue that there was any other purpose for entering the house and does not address the above-quoted statements in <u>Delancy</u>.

22

AO 72A
(Rev.8/8
2)

evidence seized in the search and the Defendants' statements about the cell phones be suppressed.

**D.** **Even if The Physical Evidence is Not Suppressed, Defendants' Statements Identifying Their Cell Phones Should be Suppressed**

As discussed above, after the Defendants were arrested and given <u>Miranda</u> warnings, each defendant invoked his right to remain silent. Nevertheless, Krawczyk subsequently asked the Defendants which telephones belonged to whom. Defendants answered and, through their answers, agents were able to determine which phones belonged to which defendant. Agents were then able to associate each defendant with incriminating conversations on particular phones.

Defendants argue that any statements made in response to questioning (about telephones, clothing, and bedrooms) should be suppressed because the Defendants had previously invoked their rights to remain silent. [Doc. 50 at 30-32]. The Government has not responded to this argument. [<u>See</u> Doc. 53]. Therefore, I assume that it has abandoned any objection to Defendants' Motions to Suppress Statements.

In the "Statement of Facts" section of its brief, the Government states that Agent Krawczyk asked Defendants about the telephones in order to inventory their property. [Doc. 53 at 8]. The Government may have intended to argue that Agent Krawczyk's questions should be considered "routine booking" questions.

23

AO 72A
(Rev.8/8
2)

"Routine booking" questions are not considered interrogation because they are reasonably related to police record-keeping concerns and therefore unrelated to Miranda concerns. See Pennsylvania v. Muniz, 496 U.S. 582, 600-02 (1990) (concluding that officer's questions fell within the "routine booking question" exception which exempts from *Miranda*'s coverage questions to secure the "'biographical data necessary to complete booking or pretrial services.'"). However, I am not aware of any authority that extends the "routine booking" exception to questions by law enforcement officers to arrestees concerning the identification of incriminating evidence. Therefore, Defendants' statements should be suppressed even if the other evidence is not suppressed.

## III.    REMAINING MOTIONS

### A.    Motion to Suppress Identification Testimony

Defendant Vazquez-Velazquez moves to suppress evidence that Janet Newburg made an out-of-court photographic identification of him as the lessee of 1986 Benthill Drive. He requested a pre-trial hearing to examine the circumstances of the identification "so that the court may determine the extent of any suggestiveness." [Doc. 22 at 1-3]. However, Vazquez-Velazquez's motion does not present any basis for the court to conclude that the identification procedure was in any way suggestive.

24

In fact, the evidence suggests that Ms. Newburg was in the presence of Vazquez-Velazquez for a substantial period of time as she observed him sign the lease for two properties (on two different occasions) that she owned. (T. 54-55).

Short of "a very substantial likelihood of irreparable misidentification," any evidence suggesting an incorrect identification is for the jury to weigh. Manson v. Brathwaite, 432 U.S. 98, 116 (1977)(quoting Simmons v. United States, 390 U.S. 377, 384 (1968)); Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012). The court is not "inevitably require[d]" to hold a hearing outside the presence of the jury whenever a defendant challenges the admissibility of a witness's identification. See Watkins v. Sowders, 449 U.S. 341, 349 (1981)(holding that the due process clause of the Fourteenth Amendment does not require a *per se* rule that an *in camera* hearing be conducted whenever a defendant challenges the admissibility of a witness's identification).

For these reasons, Defendant Vazquez-Velazquez's Motion to Suppress Identification Testimony [Doc. 22] should be denied.

### B.     Motion to Sever

Defendant Valencia-Hernandez moves to sever his case from that of his co-defendant, Vazquez-Velazquez, on the grounds that (1) there will be more evidence

AO 72A
(Rev.8/8
2)

against Vazquez-Velazquez than against him, and that this evidence will have an adverse spillover effect on him; (2) if his co-defendant fails to testify, Valencia-Hernandez may insist on his right to comment on, and argue negative inferences from, his co-defendant's failure to testify; and (3) joinder of the defendants is improper under Fed. R. Crim. P. 8.

Both Defendants are charged in each of the four counts of the indictment. Only "[i]f the jury cannot keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to each" should severance be granted. United States v. Adams, 1 F.3d 1566, 1570 (11th Cir. 1993)(citation omitted). Under the circumstances of this case, there is no reason to believe that the trial jurors will not be able to follow the trial judge's instructions and appraise the independent evidence against each defendant.

When a case involves multiple defendants, Federal Rule of Criminal Procedure 8(b) governs the issue of joinder. See United States v. Lane, 474 U.S. 438, 466 n.1 (1986). Rule 8(b) provides:

> Joinder of defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one

> or more counts together or separately and all of the
> defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). The court must look to whether the charges are unified by some "substantial identity of facts and/or participants." United States v. Morales, 868 F.2d 1562, 1569 (11th Cir. 1989)(citations omitted). This is done by examining the allegations contained in the indictment. United States v. Liss, 265 F.3d 1220, 1228 (11th Cir. 2001). Here, the allegations in the indictment all involve the events of September 16, 2010, when both Defendants were allegedly present in a house that contained cocaine, methamphetamine, and firearms. The charges, therefore, are clearly unified by the identity of facts and participants.

Finally, apart from speculation, Defendant Valencia-Hernandez has provided no basis for the court to conclude that he, and not his co-defendant, will testify at trial. Accordingly, Defendant Valencia-Hernandez has provided no basis for severance, and I therefore RECOMMEND that his motion to sever [Doc. 27] be DENIED.

## IV.    CONCLUSION

In sum, I **RECOMMEND** that Defendant Vazquez-Velazquez's Motion to Suppress Evidence [Doc. 20] be **GRANTED**; that his Motion to Suppress Statements [Doc. 21] be **GRANTED**; and that his Motion to Suppress Identification Testimony [Doc. 22] be **DENIED**.

AO 72A
(Rev.8/8
2)

For the reasons stated, I further **RECOMMEND** that Defendant Valencia-Hernandez's Motion to Sever [Doc. 27] be **DENIED** and that his Motions to Suppress Evidence and Statements [Docs. 28 and 29] be **GRANTED**.

I hereby **ORDER** that Defendant Valencia-Hernandez's Motion to Appoint New Counsel [Doc. 38] is **DENIED AS MOOT.**

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 23rd day of February, 2012.

*Gerrilyn G. Brill*

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)